UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| THE ROSS GROUP CONSTRUCTION CORPORATION, ) ) ) | |
| Plaintiff, ) ) ) | |
| v.  ) ) | Case No. 12-CV-0246-CVE-FHM |
| RIGGS CONTRACTING, INC., d/b/a RIGGS CONTRACTING CONCRETE SPECIALISTS, and SAFECO INSURANCE COMPANY OF AMERICA, ) ) ) ) ) ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Before the Court is plaintiff The Ross Group Construction Corporation's (Ross) motion for summary judgment (Dkt. # 23) and defendants Riggs Contracting, Inc. (Riggs) and Safeco Insurance Company of America's (Safeco) motion for summary judgment (Dkt. # 24). This case arises out of a construction contract between Ross, the general contractor, and Riggs, the subcontractor, to perform structural concrete work on the KC-135 Maintenance Hangar at Tinker Air Force Base. Ross contends that there was a mutually agreed construction schedule that Ross could change at will, and that Riggs was not entitled to ask for additional compensation when the schedule was delayed. Ross also asserts that Riggs is liable for the damages that Ross suffered when it contracted with third parties to complete the work described in the subcontract with Riggs. Riggs contends that Ross could not change the construction schedule without Riggs' consent and that, because Riggs did not agree to a revised schedule once delays made adherence to the original schedule impossible, Riggs was not required to perform under the subcontract.

**I.**

Ross contracted with the United States Army Corps of Engineers (USACE) to construct the KC-135 Maintenance Hangar at Tinker Air Force Base. Dkt. # 23, at 1; Dkt. # 28, at 31. Ross solicited bids from subcontractors, including bids for the structural concrete work. Dkt. ## 24-2, 24-3. Riggs submitted a bid and was awarded a subcontract to perform the structural concrete work. Dkt. # 24-3. Ross requested that Riggs begin the "submittal" process before a written subcontract was executed. Dkt. # 24-1, at 2. Submittals are "a written statement or explanation of how the trade contractors intend to comply with the plans and specifications, what equipment they plan to furnish and install, and similar technical construction information." Id. Riggs began preparing and sending submittals to Ross. Id. In September 2009, Riggs received from Ross an unsigned proposed written subcontract agreement that was backdated to July 28, 2009. Id. Riggs made three changes, including that the subcontract work would be performed according to a mutually agreeable construction schedule. Dkt. # 25-1, at 2. On October 5, 2009, Ross sent Riggs a proposed project work schedule, which called for work to begin in October 2009. Dkt. # 23-1, at 25; Dkt. # 24-6. On October 6, 2009, Riggs and Ross agreed to that project schedule. Dkt. # 23-1, at 36; Dkt. # 24-7.

In December 2009, Ross sent Riggs a backdated subcontract that included all of Riggs' proposed changes. Dkt. # 23-1, at 1; Dkt. # 24-8. Riggs signed the subcontract on December 10, 2009, and Ross signed the subcontract on December 19, 2009. The subcontract total payment was to be $679,532. Dkt. # 23-1, at 1. On January 14, 2010, Riggs, as principal, and Safeco, as surety, executed a performance bond in the amount of $679,532. Id. at 22.

At the time the subcontract was executed, the agreed start date for the project had passed, and Riggs' work could not begin in accordance with the agreed schedule because the government

had encountered site problems. Dkt. # 24-1, at 3; Dkt. # 24-28. On April 22, 2010, Riggs notified Ross that Riggs was relocating much of its business to the Arizona market and that the delay in the project start date would be problematic for Riggs "with regard to available manpower and the ability to maintain the project schedule." Dkt. # 24-1, at 4; Dkt. # 24-9. Riggs sent a letter to Ross on June 7, 2010, reiterating that a postponed start date was not "mutually agreeable." Dkt. # 24-10, at 1. On June 8, 2010, Riggs offered, for an additional payment of $144,166, to perform the subcontract if the work were to begin within 30 days of the date of the letter. Dkt. # 24-11. Ross responded that it would not issue a "change order" for additional costs due to delay because, under article VIII of the subcontract, Riggs' "sole remedy for delay shall be an extension of time." Dkt. # 24-12, at 1. Ross also attached a revised project schedule to its letter. Dkt. # 24-12, at 2. On June 10, 2010, Riggs responded that the revised project schedule was nearly eight months past the agreed start date and that there was no mutually agreeable construction schedule. Dkt. # 24-13. Riggs further stated that it would not proceed without a price increase. Id. On June 14, 2010, Ross again refused to issue a change order and stated that "[t]he current Contractor's construction schedule for [Riggs'] scope of work has been mutually agreed to by [Riggs] and [Ross] and remains unchanged." Dkt. # 24-14.

Ross issued notices of default to Riggs on June 25, June 29, July 2, and August 24, 2010. Dkt. ## 24-15, 24-18, 24-20, 24-29. Ross stated that Riggs had failed to provide submittals to Ross. Riggs responded to the notices, and claimed that it had provided the submittals, and that several submittals were rejected and were being held because of the continued project delay. Dkt. ## 24-16, 24-17, 24-19, 24-21. More specifically, Riggs stated that the remaining submittals needed input from Ross and USACE to be properly submitted, which Riggs claimed was standard protocol for

3

projects with USACE. Dkt. # 24-16. On August 5, 2010, Ross offered to provide reasonable assistance to Riggs in submitting a "pass-through" claim to USACE for increased costs due to delay, which was allowed by the subcontract. Dkt. # 28, at 35.

On August 27, 2010, Ross issued a notice of termination to Riggs, stating that Riggs "ha[d] failed to commence and continue correction of the defaults" set forth in the notices of default, "much less prosecute its work under the terms of the Subcontract Agreement . . . with 'the utmost of diligence.'" Dkt. # 23-1, at 39, 40. Ross also, contemporaneous with the notice, "demand[ed] that [Riggs'] performance bond surety complete [Riggs'] scope of work under the Subcontract." Id. Pursuant to article XIII of the subcontract, Ross had the right, "without prejudice to any other remedy," to terminate Riggs if Riggs "fail[ed] or neglect[ed] to carry out the Work in strict compliance with the Subcontract and Contract Documents or is otherwise in default of any of its obligations." Dkt. # 24-8, at 6. Further, the subcontract also allowed Ross to terminate Riggs "for convenience," which included termination without notice and without reason. Id. at 6-7. If Ross "improperly terminated" Riggs for cause, that termination would be "automatically converted to a termination for convenience." Id. However, Riggs continued to deny that it was in default because, it argued, the site was never made available to Riggs to commence work. After terminating Riggs' right to complete the work, Ross executed two subcontract agreements with third parties. Dkt. # 23-1, at 41-62. On October 16, 2010, Ross executed a subcontract for $1,028,702. with JTB Concrete Construction Company, and, on October 8, 2010, with Professional Rebar Installers, Inc., for $7,500. Id.

On April 27, 2012, Ross filed a complaint alleging two claims: breach of contract and action on the performance bond. Dkt. # 2. On Ross' breach of contract claim against Riggs, Ross seeks

4

$349,170, plus prejudgment and post-judgment interest, attorney fees, and costs. Id. at 5. Ross seeks the same amount against both Riggs and Safeco, jointly and severally, on its claim on the performance bond. Id.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." Id. at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III.

The key provisions of the subcontract that will direct the analysis are:

ARTICLE III.  CONSTRUCTION SCHEDULE: Time is of the essence and Subcontractor shall commence and prosecute the Work with the utmost of diligence to final completion in accordance with Contractor's *mutually agreeable* construction schedule and directions, furnishing all supervision, labor, material and equipment for forty (40) hours each calendar week or as necessary to comply with such schedule and directions. . . .

Subcontractor shall furnish all necessary information and will cooperate and assist in the establishing and updating of the construction schedule and in the coordination of the performance of the Work so as to minimize conflict or interference within the work of others. . . .

In agreeing to perform the Work within the specified time limits, Subcontractor has taken into account and made allowances for the delays which should be reasonably anticipated and further recognizes that time extensions will be granted only as provided for in the Contract Documents.

Dkt. # 24-8, at 2 (emphasis in original).

ARTICLE VIII.  CHANGES, EXTENSION OF TIME AND PASS-THROUGH CLAIMS: Contractor may at any time during the progress of the Work and without the prior consent of any surety or sureties make any changes of and/or to the Work, including, without limitation, the type, nature, scope or size of the Work, without invalidating this Subcontract. Before proceeding with any change, Subcontractor shall obtain written authorization or 'change order' from Contractor.  All such written authorization or 'change orders' will become a part of this Subcontract and no additional compensation, extensions of time or other changes will be recognized or paid for unless a written authorization or a 'change order' for such has been obtained from Contractor.  Failure to give written notice to Contractor within ten (10) calendar days after receipt of revised Contract Documents shall be construed as an agreement on the part of the Subcontractor to make any changes to the Work required thereby without additional compensation or extension of time. . . .

Subcontractor agrees that Subcontractor's sole remedy for delay shall be an extension of time and that Subcontractor shall make no demand for damages or extended overhead. Subcontractor further agrees that Subcontractor shall not be entitled to payment or

6

>compensation of any kind from Contractor or the Owner for direct, indirect or impact damages arising because of any hindrance or delay from any cause whatsoever.
>
>All claims which will affect or become part of a claim which Contractor is required to make under its contract with Owner within a specified time period or in a specified manner shall be made by Subcontractor as provided herein. Subcontractor shall provide Contractor with written notice and all particulars of such a "pass-through" claim, including all supporting documentation, within 10 working days preceding the time by which Contractor's claim under its contract with the owner must be made.

Id. at 5.

>ARTICLE XIII. SUBCONTRACTOR'S DEFAULT – TERMINATION FOR CAUSE: If Subcontractor fails or neglects to carry out the Work in strict compliance with the Subcontract and Contract Documents or is otherwise in default of any of its obligations thereunder, and fails to commence and continue correction of such default(s) or neglect with diligence and promptness as Contractor, in its sole discretion deems necessary, Contractor may, after 48 hours following delivery to Subcontractor of written notice thereof and without prejudice to any other remedy Contractor may have, (i) supplement Subcontractor's performance with additional material supplies, equipment or labor, pay for same and deduct the amount therefor from any money then or thereafter due Subcontractor (if such offset is not sufficient, Subcontract hereby agrees to pay any deficiency promptly upon demand), or (ii) terminate Subcontractor's continued performance under the Subcontract. Termination of performance may be immediate (without prior notice) in the event of conditions hazardous to persons or property. Any such termination of performance shall be deemed to be for cause.
>
>Upon a termination of Subcontractor's continuing performance under the Subcontract for cause, Contractor may, without limitation of any other available remedies, proceed as follows: . . . (ii) by certified mail addressed to Subcontractor's surety, if any, require the surety to provide such materials, supplies, tools, equipment, machinery, labor, services and other items as may be necessary to complete the Work in strict compliance with the Subcontract and Contract Documents. Contractor shall apply any unpaid balance under the Subcontract to pay for all such completion costs; provided, that Contractor may first require Subcontractor or its surety, if any, to fund any anticipated excess completion costs. In all such events, if the unpaid balance of the Subcontract exceeds the costs of completing the Subcontractor's Work together with interest on such costs and together with any offsets and deductions available to the Contractor, such excess shall be paid to the Subcontractor. However, if the total of all such costs, interest, deductions and offsets exceed any such unpaid balance under the Subcontract, Subcontractor or Subcontractor's surety shall pay the difference to Contractor upon demand.

> Under no circumstances shall Contractor be liable to Subcontractor for any damages, special, compensatory, punitive or otherwise, due to the breach of any express or implied duty or obligation by Contractor arising under this Subcontract.

Id. at 6.

> ARTICLE XVI. HEADINGS: The descriptive headings of the Articles of this Subcontract are for convenience of reference only and shall not be considered in the construction or interpretation of any provision.

Id.

> ARTICLE XXI. TERMINATION WITHOUT CAUSE: Contractor may at any time and without notice to any surety or sureties terminate Subcontractor's continued performance under the Subcontract for the convenience of Contractor without articulating any reason and without any default under the Subcontract. Any such termination shall be deemed to be "without cause." Upon receipt of any such notice, subcontractor will cease all work under this Subcontract, and this Subcontract shall terminate effective as of the date such notice is received by Subcontractor. . . .
>
> If Contractor is ever found to have improperly terminated Subcontractor's continued performance under this Subcontract for cause, such termination shall be automatically converted to a termination for convenience (without cause) and Subcontractor shall be limited in its recovery strictly to the compensation provided for in this article.
>
> Under no circumstances shall Contractor be liable to Subcontractor for any damages, special, compensatory, punitive or otherwise, due to the breach of any express or implied duty or obligation by Contractor arising under this Subcontract.

Id. at 7.

## IV.

Ross argues that the term "mutually agreeable" plainly means that the parties were to agree to the original schedule only, which Ross could then change or alter pursuant to article VIII of the subcontract. Dkt. ## 23, 23-1. Riggs argues that the term "mutually agreeable" means that both Riggs and Ross were required to agree to any construction schedule, and that each subsequent revised version would supplant the previous, resulting in a singular mutually agreed schedule at any time. Riggs further contends that, absent Riggs' agreement, Ross could not require Riggs to perform

8

under a schedule with a start date that was several months later than the one in the agreed October 2009 schedule. Dkt. # 27, at 16. In other words, Riggs argues that its refusal to agree to a revised schedule, absent additional compensation from Ross, released it from any obligation to perform under the subcontract, even though the schedule was already delayed at the time Riggs signed the subcontract.

"[T]he cardinal rule in contract interpretation is to determine and give effect to the intent of the parties." In re Kaufman, 37 P.3d 845, 853 (Okla. 2001); Otis Elevator Co. v. Midland Red Oak Realty, Inc., 483 F.3d 1095, 1101-02 (10th Cir. 2007) (applying Oklahoma law).[1] "It is well settled that effect should be given, if possible, to every word, phrase, clause, and sentence of a contract, and apparently conflicting provisions should be reconciled if that can be done by any reasonable construction." Cities Service Gas Co. v. Kelly-Dempsey & Co., 111 F.2d 247, 249 (10th Cir. 1940) (applying Oklahoma law). "If a contract is complete in itself, and when viewed as a totality, is unambiguous, its language is the only legitimate evidence of what the parties intended. That intention cannot be divined from extrinsic evidence but must be gathered from a four-corners' examination of the instrument." Pitco Prod. Co. v. Chaparral Energy, Inc., 63 P.3d 541, 546 (Okla. 2003) (citations omitted); Otis Elevator Co., 483 F.3d at 1102. Further, "[w]hether a contract is ambiguous and hence requires extrinsic evidence to clarify the doubt is a question of law for the courts." GEICO Gen. Ins. Co. v. Nw. Pac. Indem. Co., 115 P.3d 856, 858 (Okla. 2005) (quotation omitted).

---

[1] The subcontract includes a choice of law clause, whereby the parties agreed that Oklahoma law would govern any subcontract dispute. Dkt. # 24-8, at 6.

"'A contract is ambiguous if it is reasonably susceptible to at least two different constructions' such that 'reasonably intelligent men[ ] on reading the contract would honestly differ as to its meaning.'" Otis Elevator Co., 483 F.3d at 1102 (quoting Pitco Prod. Co., 63 P.3d at 545-46, n. 19) (alterations in Otis Elevator Co.). "The mere fact the parties disagree or press for a different construction does not make an agreement ambiguous." Id. (citing Pitco Prod. Co., 63 P.3d at 545). "To determine whether a contract is ambiguous, a court must look to the language of the entire agreement, which must be 'given its plain and ordinary meaning unless some technical term is used in a manner intended to convey a specific technical concept.'" Id. (quoting Pitco Prod. Co., 63 P.3d at 546) (citing Okla. Stat. tit. 15, § 160).

The central point of disagreement between Ross and Riggs is whether Ross was entitled to modify the original mutually agreed upon construction schedule or whether Riggs was required to agree to a new schedule when the commencement date changed by several months. Mutual is not a "technical term [ ] used in a manner intended to convey a specific technical concept." Otis Elevator Co., 483 F.3d at 1102. Mutual is defined as "shared in common" or "joint." Merriam-Webster Dictionary 768 (10th ed. 1993). When Riggs and Ross agreed that there would be a "mutually agreeable" construction schedule, the parties clearly intended that both parties would agree to the schedule. When read as a whole, the subcontract does not permit Ross to change the mutually agreed construction schedule at will. Instead, article VIII permits Ross to change the "Work," including the "type, nature, scope or size of the Work." Dkt. # 23-1, at 5. It does not include the schedule in the description of "Work." Id. It is therefore clear that Riggs was required to proceed only under a "mutually agreeable" construction schedule, agreed to by both Riggs and Ross, and not thereafter altered by Ross alone.

If the phrase "mutually agreeable" were construed, as Ross argues that it should be, to mean that the parties had to agree only to the original schedule, the result would nullify the "mutually agreeable" language because Ross would have the ability to revise the construction schedule without Riggs' agreement. Similarly, if "mutually agreeable" were read as Riggs argues that it should be, the result is equally unreasonable. Riggs would need only to refuse to agree to a schedule to be excused from any performance under the subcontract. This would be true even under facts such as these where Riggs knew that there was a delay of at least two months at the time that it signed the subcontract. The subcontract clauses providing remedies for delay (Dkt. # 24-8, at 5) and directing the subcontractor to participate in revising the schedule (Dkt. # 24-8, at 2) would be meaningless. Therefore, the Court finds that "mutually agreeable" is not ambiguous and that agreement of both parties to the schedule and any revisions was required.

Riggs also argues that it was entitled to refuse to perform, absent additional compensation, because of workforce relocation and other economic factors. In other words, Riggs argues that, although it knew the schedule was delayed by at least two months at the time it signed the subcontract agreement, it could refuse to agree to a revised schedule unless Ross agreed to additional compensation. However, increased cost of performance does not create an impossibility, or even impracticability, to performance that would excuse a party's performance. Golsen v. ONG Western, Inc., 756 P.2d 1209, 1213 (Okla. 1988); Steenberg Constr. Co. v. Prepakt Concrete Co., 381 F.2d 768, 773 (10th Cir. 1967); see W.R. Grace and Co. v. Local Union 759, 461 U.S. 757, 768 n. 12 (1983). Riggs refused to perform for wholly economic reasons. In Steenberg Construction Co., the Tenth Circuit found that the subcontractor was excused from performance only after "insurmountable" weather difficulties, which the subcontractor faced because of the contractor's

11

delays. 381 F.2d at 774. Further, the Tenth Circuit noted that, had the subcontractor been informed of the delay, and had the parties agreed to "work out a mutually satisfactory progress schedule . . . in conformity with a contemplated revised work schedule," then "mere difficulty, hardship or economic unfeasability of performance [would be] no excuse for [the subcontractor's] abandonment of the work." <u>Id.</u> at 773. In this case, Riggs was not merely informed of the delays, but Riggs knew that the start date for the project was delayed by at least two months at the time Riggs signed the subcontract. Further, because the subcontract provides that Riggs would perform according to a "<u>mutually agreeable</u> construction schedule" and that Riggs would "cooperate and assist in the establishing and updating of the construction schedule," the subcontract clearly contemplates the possibility of a revised construction schedule. Dkt. # 24-8, at 2. Riggs' economic difficulties did not create an impossibility of performance that would render its performance excused.

Numerous provisions in the subcontract make it obvious that both Riggs and Ross anticipated possible project delays. The subcontract provides that "Subcontractor shall furnish all necessary information and will cooperate and assist in the establishing and updating of the construction schedule." Dkt. # 23-1, at 2. Further, the subcontract specifically states that "Subcontractor has taken into account and made allowances for the delays which should be reasonably expected." And, finally, in article VIII, the subcontract states that "Subcontractor's sole remedy for delay shall be an extension of time and that Subcontractor shall make no demand for damages or extended

overhead."[2] Id. at 5. Therefore, the parties clearly contemplated that work on the project might be delayed at some point. In fact, at the time the parties signed the subcontract, December 2009, the agreed upon commencement date of October 2009 had already passed. Riggs argues that the language "mutually agreeable" was inserted specifically to keep Riggs from being caught in a "time trap" where the subcontract became economically disadvantageous. However, the subcontract, when read as a whole, clearly contemplates delays and specifically states that "Subcontractor shall . . . assist in the establishing and updating of the construction schedule," Dkt. # 24-8, at 2, and that "Subcontractor has taken into account and made allowances for the delays which should be reasonably anticipated," id. The phrase "mutually agreeable" cannot override other subcontract clauses. Instead, "effect should be given . . . to every word, phrase, clause, and sentence." Cities Service Gas Co., 111 F.2d at 249. While Riggs was not required to proceed without a mutually agreed construction schedule, it also had the obligation to "cooperate and assist in the establishing and updating of the construction schedule." Id. at 2. It did not have the option to refuse to perform merely due to a change in the schedule, especially because Riggs knew that the schedule was delayed at the time that it signed the subcontract. Therefore, the Court finds that Riggs breached the subcontract when it refused to complete the work defined in the subcontract unless it received the requested additional compensation.

---

[2] Although the descriptive heading of article VIII relates to changes to the work, the no-damages-for-delay clause contained therein is not limited to delays caused by change orders. Further, article XVI provides that descriptive headings "are for convenience of reference only and shall not be considered in the construction or interpretation of any provision." Dkt. # 24-8, at 6. Thus, the Court finds that the no-damages-for-delay clause is applicable to the delay at issue here.

13

Riggs also argues that it was excused from performance because Ross materially breached the subcontract by failing to make the site available to Riggs so that work could proceed in accordance with the agreed schedule. However, Ross made no such promise in the subcontract, and, therefore, a failure to make the site available on a date certain was not a material breach that would excuse Riggs' performance.

Finally, Riggs asserts that, even if it is liable for damages, Riggs should be given the chance to investigate the alleged damages suffered by Ross. Ross contends that Riggs is liable for the difference in the amount of the subcontract with Riggs and the subcontracts that Ross ultimately entered into with third parties. Because Ross was required to execute new subcontracts with third parties at a higher cost than the subcontract with Riggs, Ross is entitled to damages. Dkt. # 24-8, at 6. However, the scope of work listed in article II in the subcontract with Riggs is different from that listed in the subcontract with Professional Rebar Installers, Inc. Dkt. # 23-1, at 2, 63. And, although the scope of work listed in article II of the subcontract with Riggs is identical to that listed in the subcontract with JTB Concrete Construction Company, the work listed in exhibit six of those subcontracts differs. Id. at 2, 19, 42, 59. Therefore, there is a genuine dispute regarding the amount of damages to which Ross is entitled, and Ross' motion as to the amount of damages should be denied.

**IT IS THEREFORE ORDERED** that Ross' motion for summary judgment (Dkt. # 23) is **granted in part and denied in part**: it is **granted** as to Ross' claims for breach of contract and action on the performance bond; it is **denied** as to the amount of damages. Defendants Riggs and Safeco's motion for summary judgment (Dkt. # 24) is **denied**.

**IT IS FURTHER ORDERED** that the settlement conference remains set before Magistrate Judge T. Lane Wilson on **December 13, 2012 at 9:30 a.m.**

**IT IS FURTHER ORDERED** that the jury trial on damages remains set for **February 19, 2013 at 9:15 a.m.**

**DATED** this 14th day of November, 2012.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE