**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| THE ROSS GROUP CONSTRUCTION CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 12-CV-0246-CVE-FHM |
| RIGGS CONTRACTING, INC., d/b/a RIGGS CONTRACTING CONCRETE SPECIALISTS, and SAFECO INSURANCE COMPANY OF AMERICA | ) ) ) ) ) ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Before the Court is plaintiff The Ross Group Construction Corporation's (Ross) motion for new trial. Dkt. # 75. Ross asserts that the Court should grant a new trial because the verdict is against the weight of the evidence and because Riggs Contracting, Inc. (Riggs) and Safeco Insurance Company of America's (Safeco)[1] counsel's conduct at trial was prejudicial.

**I.**

Before trial, there were cross-motions for summary judgment. Dkt. ## 23, 24. In its summary judgment order, the Court summarized the undisputed background of this contractual dispute:

---

[1]      Although at trial Riggs was referred to as the defendant (Dkt. # 64), pursuant to a joint pretrial stipulation, the parties had agreed, inter alia, that "[a]ny jury verdict rendered in favor of Ross and against Riggs [could] be reduced by the Court to a judgment for the same amount in favor of Ross and against both Riggs and Safeco." Dkt. # 47. Any reference to defendant herein is to Riggs.

Ross contracted with the United States Army Corps of Engineers (USACE) to construct the KC-135 Maintenance Hangar at Tinker Air Force Base. Dkt. # 23, at 1; Dkt. # 28, at 31. Ross solicited bids from subcontractors, including bids for the structural concrete work. Dkt. ## 24-2, 24-3. Riggs submitted a bid and was awarded a subcontract to perform the structural concrete work. Dkt. # 24-3. Ross requested that Riggs begin the "submittal" process before a written subcontract was executed. Dkt. # 24-1, at 2. Submittals are "a written statement or explanation of how the trade contractors intend to comply with the plans and specifications, what equipment they plan to furnish and install, and similar technical construction information." Id. Riggs began preparing and sending submittals to Ross. Id. In September 2009, Riggs received from Ross an unsigned proposed written subcontract agreement that was backdated to July 28, 2009. Id. Riggs made three changes, including that the subcontract work would be performed according to a mutually agreeable construction schedule. Dkt. # 25-1, at 2. On October 5, 2009, Ross sent Riggs a proposed project work schedule, which called for work to begin in October 2009. Dkt. # 23-1, at 25; Dkt. # 24-6. On October 6, 2009, Riggs and Ross agreed to that project schedule. Dkt. # 23-1, at 36; Dkt. # 24-7. In December 2009, Ross sent Riggs a backdated subcontract that included all of Riggs' proposed changes. Dkt. # 23-1, at 1; Dkt. # 24-8. Riggs signed the subcontract on December 10, 2009, and Ross signed the subcontract on December 19, 2009. The subcontract total payment was to be $679,532. Dkt. # 23-1, at 1. On January 14, 2010, Riggs, as principal, and Safeco, as surety, executed a performance bond in the amount of $679,532. Id. at 22.

At the time the subcontract was executed, the agreed start date for the project had passed, and Riggs' work could not begin in accordance with the agreed schedule because the government had encountered site problems. Dkt. # 24-1, at 3; Dkt. # 24-28. On April 22, 2010, Riggs notified Ross that Riggs was relocating much of its business to the Arizona market and that the delay in the project start date would be problematic for Riggs "with regard to available manpower and the ability to maintain the project schedule." Dkt. # 24-1, at 4; Dkt. # 24-9. Riggs sent a letter to Ross on June 7, 2010, reiterating that a postponed start date was not "mutually agreeable." Dkt. # 24-10, at 1. On June 8, 2010, Riggs offered, for an additional payment of $144,166, to perform the subcontract if the work were to begin within 30 days of the date of the letter. Dkt. # 24-11. Ross responded that it would not issue a "change order" for additional costs due to delay because, under article VIII of the subcontract,

Riggs' "sole remedy for delay shall be an extension of time."[2]  Dkt. # 24-12, at 1. Ross also attached a revised project schedule to its letter.  Dkt. # 24-12, at 2.  On June 10, 2010, Riggs responded that the revised project schedule was nearly eight months past the agreed start date and that there was no mutually agreeable construction schedule. Dkt. # 24-13.  Riggs further stated that it would not proceed without a price increase. Id.  On June 14, 2010, Ross again refused to issue a change order and stated that "[t]he current Contractor's construction schedule for [Riggs'] scope of work has been mutually agreed to by [Riggs] and [Ross] and remains unchanged."  Dkt. # 24-14.

Ross issued notices of default to Riggs on June 25, June 29, July 2, and August 24, 2010.  Dkt. ## 24-15, 24-18, 24-20, 24-29.  Ross stated that Riggs had failed to provide submittals to Ross.  Riggs responded to the notices, and claimed that it had provided the submittals, and that several submittals were rejected and were being held because of the continued project delay. Dkt. ## 24-16, 24-17, 24-19, 24-21.  More specifically, Riggs stated that the remaining submittals needed input from Ross and USACE to be properly submitted, which Riggs claimed was standard protocol for projects with USACE. Dkt. # 24-16.  On August 5, 2010, Ross offered to provide reasonable assistance to Riggs in submitting a "pass-through" claim to USACE for increased costs due to delay, which was allowed by the subcontract. Dkt. # 28, at 35.[3]

_____

[2]    The entirety of the "no damages for delay" clause in article VIII of the subcontract provides: "Subcontractor agrees that Subcontractor's sole remedy for delay shall be an extension of time and that Subcontractor shall make no demand for damages or extended overhead. Subcontractor further agrees that Subcontractor shall not be entitled to payment or compensation of any kind from Contractor [Ross] or the Owner [USACE] for direct, indirect or impact damages arising because of any hinderance [sic] or delay from any cause whatsoever." Dkt. # 23-1, at 5 (footnote not in original).

[3]    Ross stated in the letter that, "[t]o enable [Riggs] and [Ross] to proceed with construction of the hangar project while protecting all of their rights to additional compensation, [Ross] recommends that [Riggs] and [Ross] agree they will notify USACE that [Riggs] is reserving its right to present a claim for additional compensation for performance." Dkt. # 28, at 25. "When [Riggs'] performance is complete, it can prepare its claim, and submit it to [Ross] to be presented to USACE as a pass-through claim." Id.  Ross would offer "reasonable assistance to [Riggs] in the submission of the pass-through claim as allowed in the Subcontract Agreement." Id.

Under the subcontract, a pass-through claim is a claim "which will affect or become part of a claim which Contractor is required to make under its contract with Owner[.]" Dkt. # 23-1, at 5.  A pass-through claim must be made "within a specified time period or in a specified
(continued...)

On August 27, 2010, Ross issued a notice of termination to Riggs, stating that Riggs "ha[d] failed to commence and continue correction of the defaults" set forth in the notices of default, "much less prosecute its work under the terms of the Subcontract Agreement . . . with 'the utmost of diligence.'" Dkt. # 23-1, at 39, 40. Ross also, contemporaneous with the notice, "demand[ed] that [Riggs'] performance bond surety complete [Riggs'] scope of work under the Subcontract." Id. Pursuant to article XIII of the subcontract, Ross had the right, "without prejudice to any other remedy," to terminate Riggs if Riggs "fail[ed] or neglect[ed] to carry out the Work in strict compliance with the Subcontract and Contract Documents or is otherwise in default of any of its obligations." Dkt. # 24-8, at 6. Further, the subcontract also allowed Ross to terminate Riggs "for convenience," which included termination without notice and without reason. Id. at 6-7. If Ross "improperly terminated" Riggs for cause, that termination would be "automatically converted to a termination for convenience." Id. However, Riggs continued to deny that it was in default because, it argued, the site was never made available to Riggs to commence work. After terminating Riggs' right to complete the work, Ross executed two subcontract agreements with third parties. Dkt. # 23-1, at 41-62. On October 16, 2010, Ross executed a subcontract for $1,028,702. with JTB Concrete Construction Company, and, on October 8, 2010, with Professional Rebar Installers, Inc., for $7,500. Id.

Dkt. # 31, at 2-5. The main arguments made by both parties in their cross-motions for summary judgment centered on the meaning of the phrase "<u>mutually agreeable</u> construction schedule" in the subcontract. See Dkt. # 23-1, at 2 (emphasis in original). Based upon the summary judgment

---

3       (...continued)
manner [and] shall be made by Subcontractor. . . ." Id. Riggs was to "provide [Ross] with written notice and all particulars of such a 'pass-through' claim, including all supporting documentation, within 10 working days preceding the time by which Contractor's claim under its contract with the owner must be made." Id. The subcontract further provided that "[f]ailure to submit all particulars of such a claim, including all supporting documentation, within such time shall absolve [Ross] and [USACE] of all obligations therefor. . . ." Id. Further, "[n]otwithstanding anything in this Subcontract or the Contract Documents to the contrary, to the extent such a claim is ultimately a claim against [ ] [USACE] or the Architect/Engineer, [Riggs] agrees that [Ross] shall only be liable to [ ] [Riggs] only to the extent that [Ross] actually recovers damages or receives time extensions or additional costs from [USACE] pertaining to such claims. Id. (footnote not in original).

record[4] and the undisputed facts, the Court found that Riggs refused to perform for wholly economic reasons - - its move to Arizona made performing the subcontract work more expensive than Riggs anticipated when it bid the project, but that "Riggs' economic difficulties did not create an impossibility of performance that would render its performance excused." Dkt. # 31, at 12.  The Court relied upon several subcontract provisions, including that "Subcontractor shall furnish all necessary information and will cooperate and assist in the establishing and updating of the construction schedule[ ]" (Dkt. # 23-1, at 2) and "Subcontractor's sole remedy for delay shall be an extension of time and that Subcontractor shall make no demand for damages or extended overhead[ ]" (id. at 5), as evidence that "the parties clearly contemplated work on the project might be delayed at some point." Dkt. # 31, at 12-13.  Thus, because a contract should be read so as to give effect "to

---

[4]     Neither party submitted the entire USACE/Ross prime contract as part of the summary judgment record.  Instead, Ross submitted, as part of its response to Riggs' motion for summary judgment, a one-page excerpt, including a section entitled "SUSPENSION OF WORK" that allowed the USACE "Contracting Officer" to suspend work for the convenience of USACE.  Dkt. # 28, at 32.  In its brief, Ross included only one paragraph of argument or analysis of the prime contract language.  See id. at 18.  Also, in Ross' reply in support of its summary judgment motion (Dkt. # 29), Ross included one paragraph, similar to that included in its response, regarding the suspension of work section.  Id. at 8.  Ross argued that the subcontract's specific, "*no-damages-for-delay* clause" meant that the contract must be interpreted such that Riggs could not fail to perform simply because the schedule was delayed, despite any language in the prime contract.  See id. at 11.  Further, Ross argued that, because Ross offered to assist Riggs in asserting a pass-through claim pursuant to the subcontract, and because Riggs failed to respond (and thereafter refused to perform), Riggs had waived any "contractual right to equitable compensation." Id.  Finally, in Riggs' reply in support of its summary judgment motion (Dkt. # 30), Riggs addressed the prime contract's suspension of work clause and agreed that, if there were a conflict between the prime and subcontracts, subcontract language should control (id. at 8) but, to the extent the prime contract language controlled the outcome of the parties' dispute, Riggs asserted that Ross should have submitted to USACE Ross' claim for excess costs caused by Riggs' non-performance. Id. at 8-9.  In other words, both parties asserted (for different reasons) that the prime contract section was inapplicable to the dispute and that the issues should be resolved based on subcontract language.  Clearly, neither party believed the entire prime contract was relevant to the issue of Riggs' breach or termination.

every word, phrase, clause, and sentence[,]" <u>Cities Service Gas Co. v. Kelly-Dempsey & Co.</u>, 111 F.2d 247, 249 (10th Cir. 1940), the Court found that "Riggs breached the subcontract when it refused to complete the work defined in the subcontract unless it received the requested additional compensation" (Dkt. # 31, at 13), and that, because the Riggs subcontract did not include a clause requiring Ross "to make the site available to Riggs so that work could proceed in accordance with the agreed schedule[,] . . . a failure [by Ross] to make the site available on a date certain was not a material breach that would excuse Riggs' performance." <u>Id.</u> at 14.  Finally, although Riggs' refusal to perform absent additional compensation was a breach and Ross was entitled to damages, the Court concluded "there [was] a genuine dispute regarding the amount of damages to which Ross [was] entitled, and Ross' motion as to the amount of damages" was denied.  <u>Id.</u>

Therefore, the Court granted in part and denied in part Ross' motion for summary judgment (Dkt. # 23), and denied Riggs and Safeco's motion for summary judgment (Dkt. # 24).[5]  Dkt. # 31, at 14.  A jury trial was to proceed on the amount of Ross' damages only. <u>Id.</u> at 15.

## II.

In the pretrial order, the parties agreed to the following statement of the case:

> This is an action by the Ross Group Construction Corporation ("Ross") to recover damages for breach of a construction subcontract under which Riggs Contracting, Inc. ("Riggs") agreed to perform concrete work on the new KC-135 Maintenance Hanger at Tinker Air Force Base, Oklahoma City, Oklahoma.  Ross was the general contractor and Riggs was the concrete subcontractor.  Riggs, as

---

[5]     The summary judgment ruling that Riggs breached the subcontract is law of the case. <u>Homans v. City of Albuquerque</u>, 366 F.3d 900, 905 (10th Cir. 2004) ("In general, the law of the case doctrine provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" (quoting <u>Arizona v. California</u>, 460 U.S. 605, 618 (1983))); 18B Edward H. Cooper, <u>Federal Practice and Procedure: Jurisdiction and Related Matters</u>, § 4478 (2d. ed. 2013).

principal, and Safeco Insurance Company of America ("Safeco"), as surety, made and executed a performance bond covering the subcontract between Ross and Riggs.

Pursuant to an agreement between counsel for the parties, Ross is amending (in this pretrial order) the amount of damages it claims to have suffered by including an item of cost previously overlooked, making the total amount of its damage claim $365,273, and the defendants, Riggs and Safeco, are raising the affirmative defense of failure to mitigate.[6]

Therefore, the only issues to be tried to the jury are the damages claimed by Ross and the claim of Riggs and Safeco that Ross breached its legal obligation to mitigate its damages by taking reasonable steps to avoid the claimed losses.

Dkt. # 46, at 1-2.  A jury trial was held on May 28-29, 2013, although all of the evidence was introduced on the first day of trial.[7]

---

[6]   The defense of failure to mitigate damages was not before the Court when it entered the summary judgment order.  Instead, Riggs asserted the defense of failure to mitigate damages for the first time in the pretrial order.  Dkt. # 46, at 1.

[7]   Without objection, the Court read the following statement of the case to the jury:

> PLAINTIFF THE ROSS GROUP CONSTRUCTION CORPORATION (ROSS) ENTERED INTO A SUBCONTRACT WITH RIGGS CONTRACTING, INC. (RIGGS) TO PERFORM STRUCTURAL CONCRETE WORK ON THE KC-135 MAINTENANCE HANGAR AT TINKER AIR FORCE BASE. ROSS WAS THE GENERAL CONTRACTOR, AND RIGGS WAS THE SUBCONTRACTOR.
>
> THE COURT HAS PREVIOUSLY FOUND THAT RIGGS BREACHED THE SUBCONTRACT. AFTER RIGGS BREACHED THE SUBCONTRACT, ROSS ENTERED INTO ADDITIONAL SUBCONTRACTS WITH THIRD PARTIES TO PERFORM THE WORK DESCRIBED IN THE SUBCONTRACT WITH RIGGS. ROSS ARGUES THAT IT WAS REQUIRED TO PAY THOSE THIRD PARTIES MORE THAN IT WOULD HAVE PAID RIGGS FOR THE SAME WORK. RIGGS ARGUES THAT ROSS FAILED TO TAKE REASONABLE MEASURES TO AVOID ANY DAMAGES THAT IT MAY HAVE SUFFERED.
>
> THE ONLY ISSUES FOR YOU TO DECIDE ARE THE AMOUNT OF DAMAGES, IF ANY, THAT ROSS SUFFERED AS A RESULT OF RIGGS' BREACH AND WHETHER ROSS COULD HAVE REASONABLY AVOIDED ANY DAMAGES.

(continued...)

Evidence at trial consisted of one stipulation,[8] numerous exhibits, and testimony of four witnesses.  Without objection, plaintiff offered as an exhibit the one-page excerpt from its prime contract with USACE (Plaintiff's Exhibit 3) that it had included in the summary judgment record.[9] See note 4, supra.  Riggs offered, without objection, one additional page of the prime contract (Defendant's Exhibit 10) that included a section entitled "CHANGES", which provided that the USACE "Contracting Officer" could issue a change order and make changes to the work.[10]

With that background, the Court will turn to a summary of the witness testimony on the two issues for the jury.

**1. Ross' Damages**[11]

David Thomas, the chief operating officer of Ross (Dkt. # 73, at 17), confirmed that Ross entered into a contract with USACE to construct an aircraft maintenance hangar at Tinker Air Force

---

[7]    (...continued)
Dkt. # 63, at 3.

[8]    The parties stipulated that the Ross/Riggs subcontract amount payable to Riggs was $685,012.  Dkt. # 65-1, at 7.

[9]    Also included in the exhibit, which totaled two pages, was a cover page with no substantive provisions.

[10]    Before jury selection on the morning of trial, the parties presented argument as to whether defense counsel could use the prime contract in its questioning of witnesses.  The Court ruled that the parties could inquire if the questions were relevant to the defense of failure to mitigate.  See Dkt. # 72, at 10-12, 17-18.  The Court reminded the parties that, because it had not seen or studied the entirety of the prime contract (only the one page provided in the summary judgment record, which both parties argued was superceded by the specific subcontract language), it would take objections as they arose, rather than ruling "in a vacuum."  Id. at 9-11.  The Court declined to issue a legal opinion regarding the prime contract because it had read only the one page.  See id. at 7-11.  Riggs admitted that its argument rested entirely on Ross' failure to attempt to mitigate its damages.  Id. at 11, 17-18.

[11]    Except David Thomas, all witnesses were called by Riggs.

Base (id. at 17-19, 42-43).  And, because Riggs specialized in concrete (see id. at 96), Ross subcontracted with Riggs to do all of the concrete work on the project.  Id. at 19-22.  Riggs' subcontract was in the amount of $679,532 (id. at 23), but a subsequent change order increased the total amount of the subcontract to $685,012.  Id. at 23-25.

At the time of Riggs' termination, Riggs had "placed three light pole bases[ ]" (id. at 26), and Ross was required to find third parties to perform the remainder of the work included in the Riggs subcontract.  Id. at 26-36.  Ross separated the work in the Riggs subcontract and found two subcontractors and one supplier to complete the work. Id.  Using a demonstrative exhibit, Thomas testified that, to calculate Ross' claimed damages, Thomas subtracted, from the total costs to complete the Riggs subcontract work, the costs of the work that Riggs completed and subtracted the cost to complete the work in the third party subcontracts that had not been included in the Riggs' subcontract.  Id. at 29-37, 39.  The total damages presented amounted to $365,273.  Id. at 39.

Thomas' calculation was not challenged and the remainder of the testimony centered on Riggs' defense of failure to mitigate.

## 2. Riggs' Defense of Failure to Mitigate

The testimony regarding Riggs' defense of failure to mitigate can be separated into three assertions: a) Ross' claimed damages were unreasonable; b) Ross failed to submit to USACE a pass-through claim at the time that Riggs demanded additional compensation to complete the subcontract work; and c) Ross should have submitted Ross' claimed damages, due to Riggs' breach, to USACE for reimbursement at the time that Ross submitted its other claims for reimbursement.

a) Ross' claimed damages were unreasonable

There was testimony that Ross' claimed damages were unreasonable because Riggs could have completed the subcontract work for an additional $144,166.  Mark Hackett, Ross' project manager for the job at Tinker Air Force Base, stated that Riggs provided Ross with the amount of additional compensation required to complete the subcontract work, and Ross may have asked for a "breakdown" of that price from Riggs, including the names of suppliers or subcontractors. Id. 77. Abe Krejci, project manager for Riggs on this job, and Brian Davidson, vice president of construction and part-owner of Riggs, testified that Riggs could have completed the Riggs subcontract work for an additional $144,166 (id. at 94-98), and if Ross had paid that amount to complete the work, it would have been a fair and reasonable sum at that time.  Id. at 94-97, 103-08.

Davidson testified that the amount that Ross ultimately paid to complete the Riggs subcontract work seemed "excessive."  Id. at 107-08.  The testimony was undisputed that Riggs requested an additional $144,166 to complete the job.  See id.

b) Ross failed to submit to USACE a pass-through claim at the time that Riggs demanded additional compensation to complete the subcontract work

Riggs asserted that, prior to Riggs' termination, Ross could have submitted a pass-through claim to USACE for reimbursement of Riggs' additional costs to complete the subcontract work. However, the Court ruled before trial that testimony regarding a non-existent pass-through claim or evidence regarding pre-breach delay was irrelevant and inadmissible.  This is because the Court ruled on summary judgment that Ross offered to assert a pass-through claim for Riggs but Riggs failed to respond to the offer and refused to perform (Dkt. # 23-1, at 38-39), and, therefore, Riggs "breached the subcontract when it refused to complete the work defined in the subcontract unless

10

it received the requested additional compensation."[12]  Dkt. # 31, at 12-13.  Numerous times, the

Court sustained objections to Riggs' questions about delay and/or a pass-through claim prior to

Riggs' breach, and it reminded the jury that the Court had already ruled that Riggs breached the

subcontract.  Dkt. # 73, at 43-45, 51-52, 54-55, 58, 75-77, 88-89, 96-99.  Thus, any evidence of an

unasserted pass-through claim before Riggs refused to perform and was terminated was irrelevant

to the issues at trial.

        In the letter Riggs sent to Ross demanding additional compensation in the amount of

$144,166 to complete the subcontract work, Riggs provided no detail and imposed a 30-day deadline

by which Ross was required to accept it.  Id. at 66-68, 99-101, 104-06.  Riggs thereafter notified

Ross that it had "withdrawn" its offer and would not perform.  Id. at 68.  This $144,166 is one

amount, however, that Riggs asserted at trial that Ross could and should have submitted to USACE

for reimbursement when Ross submitted its claims for reimbursement due to Ross' personnel on site

and extra work performed by Ross during the year-long delay.

        The prime contract, including the Federal Acquisition Regulations (FARs), was incorporated

into the subcontract.  Id. at 49-51, 78, 88-89.  The FARs included the "CHANGES" provision.  Id.

at 78-79.  Reading from a change order proposal, Riggs' counsel questioned Ross' failure to make

a pass-through claim and subsequent waiver of that right when Ross signed a release; however,

Thomas testified that several months passed between Riggs' termination in August 2010 (id. at 64-

65) and Ross' claims to USACE for Ross' increased costs on March 31, 2011 (see Dkt. # 65-1, at

---

[12]     Further, it is clear from the subcontract language that it was Riggs' duty to submit a pass-
         through claim, and Riggs' failure to provide Ross with "written notice and all particulars of
         such a 'pass-through' claim[ ]" (Dkt. # 23-1, at 5) absolved Ross or USACE of any
         obligation to reimburse Riggs for costs due to delays that should have been asserted via a
         pass-through claim.  Id.

6 (Riggs' Exhibits 11, 12, 13, 14)).  Thus, Ross did not make its request for reimbursement, in which Ross allegedly failed to mitigate by including the increased costs due to Riggs' breach, until months after Riggs was terminated.

c) Ross should have submitted Ross' claimed damages, due to Riggs' breach, to USACE for reimbursement at the time that Ross submitted its other claims for reimbursement

Riggs' argued that, at the time that Ross made its claim for reimbursement to USACE for additional compensation due to personnel on site and additional work completed, Ross should have included in its claim the damages it claimed to have incurred because of Riggs' breach.  Ross submitted a claim to USACE for reimbursement in the amount of $468,863 (id. at 46-49, 55-60, 82-88), which was "directly related to [Ross'] personnel that were on site for that year."  Id. at 68. Riggs' counsel inquired about the change orders that increased the amount of Ross' contract with USACE and extended the project completion dated by 245 days.  Id. at 46-49, 55-70, 82-88.  The prime contract provision, "CHANGES," the continuation of which was printed on the third page of Riggs' Exhibit 10, was the basis for Ross' claims for reimbursement.  Id. at 55, 78-79, 82-85.

Thomas and Hackett testified that Ross did not submit to USACE for reimbursement the damages due to Riggs' breach because it was not justifiable.  Id. at 60-62, 64-66, 82-83, 89-90.  In explanation, Thomas stated there was a difference between excess costs due to a subcontractor breach or default "and material and labor and price increase."  Id. at 60-61.

After submitting its claim to USACE for its incurred costs, Ross signed a document entitled "Release," which released any claims that Ross may have asserted on its own behalf or on behalf of others, including Riggs, because of increased costs.  Id. at 56-57.  The reimbursed costs Ross received were related to personnel on site during the year-long delay.  Id. at 68.  To Hackett and

12

Thomas' knowledge, USACE does not pay additional expenses or costs incurred by the contractor because a subcontractor breached or refused to perform. Id. at 68-70, 91-92.

As to the defense of failure to mitigate damages, the jury was instructed that

> A PARTY WHO ASSERTS A CLAIM FOR BREACH OF CONTRACT HAS A DUTY TO USE REASONABLE EFFORTS TO MITIGATE DAMAGES. RECOVERY OF DAMAGES IS NOT ALLOWED FOR ANY LOSSES THAT ROSS REASONABLY COULD HAVE AVOIDED. YOU SHOULD DEDUCT, FROM ANY AWARD OF DAMAGES TO ROSS, THE AMOUNT OF DAMAGES, IF ANY, THAT ROSS REASONABLY COULD HAVE AVOIDED.

Dkt. # 63, at 21. The jury returned a verdict for Riggs. Dkt. ## 64, 67. Ross filed this motion for new trial (Dkt. # 75), to which Riggs responded (Dkt. # 76), and Ross replied (Dkt. # 78).

## III.

Ross' motion for new trial is reviewed under Fed. R. Civ. P. 59(a)(1), which provides that a "court may, on motion, grant a new trial on all or some of the issues--and to any party . . . (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]"[13]

A "trial court's authority to grant a new trial 'is large.'" Voda v. Medtronic, Inc., 899 F. Supp. 2d 1188, 1193 (W.D. Okla. 2012) (quoting Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415 (1996)). "A motion for new trial on the grounds that the jury verdict is against the weight of the evidence normally involves a review of the facts presented at trial, and thus involves the discretion of the trial court." Black v. Hieb's Enters., Inc., 805 F.2d 360, 363 (10th Cir. 1986)

---

[13]    Ross did not move for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. However, "Even if no rule 50(a) motion was made[,] . . . the court is still permitted to entertain a rule 59 motion for new trial on the basis that the verdict was based on a quantum of evidence that is insufficient as a matter of law." Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 728 F. Supp. 2d 1170, 1184 (D.N.M. 2010); 9B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2537 (3d ed. 2008).

(citing Brown v. McGraw-Edison Co., 736 F.2d 609, 617 (10th Cir. 1984)) (remaining citations omitted). The trial court's "inquiry [should] focus[ ] on whether the verdict is clearly, decidedly or overwhelmingly against the weight of the evidence." Id.; Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1110 (10th Cir. 2001) (A trial court abuses its discretion to deny a motion "when 'the verdict is clearly, decidedly or overwhelmingly against the weight of the evidence.'" (citing Black, 805 F.2d at 363)).

## IV.

Ross asserts that the Court should grant a new trial because the verdict is clearly against the weight of the evidence.  As to Ross' damages, the jury was instructed that, to calculate the amount of damages, it should calculate the reasonable costs incurred by Ross to complete the Riggs' subcontract work and then subtract the subcontract price.  Dkt. # 63, at 17.  The jury was further instructed that it should award damages even if it was uncertain as to the amount, because damages do not need to proven with mathematical certainty.  Id. at 20.  Ross claimed damages in the amount of $365,273, and Thomas testified as to how Ross calculated that amount.  Dkt. # 73, at 27-39.  However, Krejci testified that Riggs offered to do the same work for an additional $144,166 in compensation, and Davidson testified that $144,166 was a fair amount to pay for completing the scope of work.  Id. at 97, 99-100, 105-06.  Thus, Riggs presented evidence that, prior to being terminated, Riggs informed Ross that it could have completed the work, using its subcontractors and suppliers, for an additional $144,166, and that Ross' claimed damages of $365,273 were unreasonable and "seem[ed] excessive."  Id. at 96-97, 99-101, 108.  From the above evidence, the jury could have concluded that Ross could have avoided some of its losses, and that amount should have been deducted from any damages award.

14

Riggs' evidence showed that, at the very least, it would have cost $144,166 more than the amount of the Riggs subcontract for Ross to complete that same scope of work.  Riggs failed to present any evidence or elicit any testimony of further reductions to the claimed damages.  For example, Riggs did not submit evidence of subcontractors or suppliers who could have performed the work at a lower cost.  Instead, Riggs' witnesses testified that Ross incurred at least $144,166 in damages.  See id. at 97, 99-101, 105-06.  Although Riggs' counsel argued that Ross should have submitted Ross' damages, due to Riggs' breach, to USACE at the same time that Ross submitted its increased costs due to personnel on site and extra work completed during the year-long delay, Riggs presented no evidence that Ross either had a duty to submit such costs to USACE or that submission of such costs would have made any impact.  See notes 3, 4, supra, and note 14, infra. Instead, there was evidence that submitting those damages to USACE would have been fruitless - - both Thomas and Hackett, a witness Riggs called, testified that USACE would not have paid any part of those costs, even if the costs had been submitted, due to lack of justification.  Id. at 60, 90. Further, pursuant to subcontract language regarding pass-through claims, it was Riggs' burden to submit a pass-through claim.  Dkt. # 23-1, at 5 ("All claims which will affect or become part of a claim which Contractor is required to make under its contract with Owner within a specified period or in a specified manner shall be made by Subcontractor[.]").  Once Riggs failed to request a pass-through claim and "submit all particulars of such a claim, including all supporting documentation," id., Ross was "absolve[d]" . . . of all obligations[.]" Id.  Since it was Riggs' burden to submit any pass-through claim, all evidence regarding Ross' failure to submit such a claim was clearly irrelevant and could not support a jury verdict in Riggs' favor.

Therefore, even according to Riggs' witnesses, Ross suffered some damages - - the only question was the amount.  It is undisputed that Ross was ultimately required to pay more to third parties to perform the scope of work covered in the Riggs subcontract.  Riggs admits that, even if Ross had requested the names of subcontractors or suppliers who might have performed the subcontract work "much less expensively", Ross would still have incurred some damages from Riggs' breach.  See Dkt. # 76, at 8-10.  Riggs does not assert, and could not assert, that Ross failed to prove any damages - - Riggs' own witnesses testified that Ross would have been required to pay at least $144,166 in additional compensation and, had Ross paid that amount, it would have been a reasonable and fair amount to pay to complete the scope of work at that time. See id. at 9.  Riggs' argument rested on a failure to attempt to mitigate - - Riggs asserted that Ross should have also included, in its claim to USACE, the extra amount demanded by Riggs ($144,166) or the amount Ross ultimately paid to complete that scope of work ($365,273). However, Riggs' argument relied on two provisions of the prime contract, and neither provision applied or allowed Ross to recover costs related to Riggs' refusal to perform.[14]   See note 4, supra.  Therefore, the jury's verdict is

---

[14]     The questions Riggs asked of witnesses during trial regarding the prime contract were not relevant to the issues before the jury: Ross' damages and alleged failure to mitigate.  Instead, Riggs utilized the prime contract to subvert the Court's summary judgment order and pretrial rulings.  Riggs, in effect, argued that at least one provision of the prime contract allowed Ross to make a claim for the same damages Ross was claiming that Riggs owed it.  More specifically, Riggs asserted that, in Ross' claim for reimbursement due to extra work performed to ready the site and for personnel on the site during a year-long delay, Ross should have included extra costs associated with Riggs' breach - - either the amount Riggs demanded before it would proceed or the amount that Ross ultimately paid third parties to perform the Riggs subcontract work.  Two sections of the prime contract were presented as evidence at trial.  The suspension of work section, supra, note 4, was presented as part of the summary judgment record and both parties agreed that the language of the prime contract did not control the outcome of the dispute; instead, for differing reasons, the parties asserted that the language of the subcontract controlled.  The Court found that the specific language
(continued...)

---

[14]     (...continued)

of the no damages for delay clause did control and that Riggs was not entitled to demand additional compensation as a condition of performance of the subcontract.  The language of the no damages for delay clause ("[Riggs] further agrees that [Riggs] shall not be entitled to payment or compensation of any kind from [Ross] or [ ] USACE for direct, indirect or impact damages arising because of any hinderance [sic] or delay from any cause whatsoever[ ]" (Dkt. # 23-1, at 5)), clearly meant that Riggs could not demand additional compensation prior to performing, and any language in the prime contract "SUSPENSION OF WORK" section did not dictate a different finding.  Further, at trial, the testimony was that the section entitled "CHANGES", which was raised for the first time during trial, was the applicable section under which Ross could and did seek reimbursement from USACE for its increased costs.  See Dkt. # 73, at 55, 82-85.

However, Ross made its claim for reimbursement "months" (id. at 58) after Ross terminated Riggs.  And, Ross' employees, Thomas and Hackett, testified that, after a subcontractor is terminated due to refusal to perform, Ross could not thereafter justify claiming additional costs caused by that subcontractor's refusal to perform.  See id. at 60, 90.  Further, during the period of delay at issue, Ross had personnel at the site, which contributed to its increased costs (id. at 68); however, Riggs had not yet begun more than minimal work (three light pole bases) - - thus, its costs stemmed from suppliers' price increases between the time Riggs expected the work to commence and the time work actually commenced on the project.  Therefore, the "CHANGES" section was clearly inapplicable to Ross' damages sustained as a result of Riggs' breach, because that section applied when the USACE "Contracting Officer" made "changes in the work within the general scope of the contract," and issued a change order for that change in the work.  See Defendant's Exhibit 10.

Thus, although the Court preliminarily ruled that the parties could inquire about the prime contract if it related to the failure to mitigate defense, Riggs' questions regarding the prime contract and its relation to Ross' failure to mitigate were irrelevant and likely confused the jury.  The Court reminded the jury multiple times that the Court had decided the issue of breach of contract (see Dkt. # 63, at 3), including instructing the jury during trial that it had already decided that issue (see Dkt. # 73, at 55), but Riggs' repeated irrelevant questions confused the issues of breach of the subcontract and Ross' alleged failure to mitigate its damages by not submitting to USACE its additional costs incurred because of Riggs' breach.  The jury was instructed that only the damages Ross reasonably could have avoided (Dkt. # 63, at 21) should be subtracted from the damages it suffered, and neither Riggs nor Ross objected to that instruction.  Dkt. # 74, at 4-7. The jury could not have found from the evidence that Ross reasonably could have avoided any damages by submitting a claim for reimbursement to USACE, especially because the two portions of the prime contract that the parties introduced were inapplicable - - suspension of work and change orders.

(continued...)

clearly, decidedly, and overwhelmingly against the weight of the evidence, and the Court finds that

a new trial is warranted.  As such, the Court need not reach Ross' second argument that Riggs'

counsel made improper and prejudicial remarks that resulted in a fundamentally unfair trial.

**IT IS THEREFORE ORDERED** that plaintiff The Ross Group Construction Corporation's

(Ross) motion for new trial (Dkt. # 75) is **granted**.

**IT IS FURTHER ORDERED** that Riggs Contracting, Inc.'s motion for attorney fees (Dkt.

# 68) and the Report and Recommendation (Dkt. ## 77, 79)[15] regarding Riggs' motion are **moot**.

**IT IS FURTHER ORDERED** that the Judgment (Dkt. # 67) is **vacated** and a new trial is

set for **October 21, 2013 at 9:15 a.m.**  At the retrial, issues of relevance will be determined by the

summary judgment order (Dkt. # 31) and this Opinion and Order.

---

[14]      (...continued)

Ross also either failed to object to some of Riggs' irrelevant questions or objected belatedly. See, e.g., Dkt. # 73, at 56-58, 60-62, 78, 83-86.  Although the Court cannot and will not speculate as to the bases for the jury's decision, the Court notes that the confusing and irrelevant questions of Riggs were compounded by Ross' failure to timely object to all irrelevant statements or questions by Riggs' counsel.

Finally, the presentation of evidence lasted only one day (Dkt. # 65); and, although the Court instructed the jury that the issue of breach was not before it (Dkt. # 63, at 3), Riggs' defense strategy, through statements and questions to witnesses, did not become fully apparent until the end of the trial.  However, it became clear by the end of the testimony that Riggs' argument was that Ross failed to attempt to obtain reimbursement of costs from USACE arising from Riggs' refusal to perform, despite the absence of evidence that such a request would have been fruitful or reasonable, let alone required.  See supra, note 3.

[15]      The magistrate judge entered a Corrected Report and Recommendation to correct the date by which Ross was required to file an objection; however, the substance of the Report and Recommendation remained the same.

**DATED** this 27th day of August, 2013.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE